Dorothy C. CURRAN, Claimant Below,
Appellant,

v.

AIRPORT SHUTTLE SERVICE, INC.,
Respondent Below, Appellee.

Superior Court of Delaware.

New Castle.

Feb. 2, 1968.

Sidney Balick and Arthur Inden (of Aerenson & Balick), Wilmington, for appellant.

Max S. Bell (of Richards, Layton & Finger), Wilmington, for appellee.

STIFTEL, President Judge.

The claimant-widow appeals from a decision of the Industrial Accident Board ("the Board") denying her compensation claim on the ground that she failed to meet the burden of proving that her husband's fatal injuries arose "out of and in the course of his employment".

Curran, the decedent, was employed by Airport Shuttle Service, Inc., as a driver. He operated a station wagon for his employer's shuttle service between the Wilmington area and the Philadelphia Airport. On April 28, 1965, he began work for the day by leaving his house at 3:30 P.M. and driving the company station wagon, which had remained at his home, to the airport. At 10:30 that night he made his final run to the airport. He arrived there at 11:30 and remained in the general vicinity of his employer's dispatch desk at the airport until midnight. During that time the company dispatcher, Mrs. Patricia Stranghan, saw him several times and then noticed that he disappeared. She thought this insignificant because ofttimes drivers would go upstairs and "have coffee or something of that sort." However, from 12:25 A.M. until 1:00 A.M. of the 29th, while he was absent, Curran made three telephone calls to the dispatcher. At 12:25 Curran told Mrs. Stranghan by phone that he was only about five minutes away and that, if he was not needed then, he'd call back later "within a half hour or so." He did call back, and was informed that he had a "trip that was due out." Curran then asked Mrs. Stranghan whether another driver, George Davis, could take the trip. She handed the phone to Davis, who arranged with Curran for Davis to take the next trip to Wilmington. Such an arrangement between drivers was not unusual as long as the

required trip was covered. Curran then made a third phone call, at 1:00 A.M. In answering the 1:00 call, Mrs. Stranghan told Curran that he was dismissed from further duty, because another driver was present to cover the last run from the airport. During the third call, Mrs. Stranghan testified that she overheard Curran give his telephone number to the operator when he called her Olympia telephone number at the airport. She then testified that she jotted down the number and later turned it over to a company official, and that the number contained a Tremont exchange, which, she said, was in the Chester area. The record is silent as to why the employer Shuttle Service failed to use the number to find the location from which Curran made the 1:00 A.M. call on the 29th, so that people at this location could have been interviewed.

As previously mentioned, Curran was discharged at 1:00 A.M. When a driver was discharged (dismissed without passengers), he would customarily drive to Wilmington, a trip requiring about an hour, and go to the company service garage. The garage was open 24 hours a day to service Shuttle vehicles as well as taxicabs. Someone was always present at the garage, although Airport Shuttle personnel normally left about 2:00 A.M., but the automobile mechanics worked all night. The driver returning with the Shuttle vehicle was required to place the day's proceeds in a safe. The drivers' receipts were checked at approximately 8:00 in the morning of the next day, by an employee who reported for work at that time. Drivers on Curran's particular shift, the night shift starting at 4:00 P.M., were ordinarily required to leave the Shuttle vehicles in the garage for service. However, Curran was at that time allowed to take a vehicle—either the one he was driving or another—back to his home.

After the 1:00 A.M. call on the 29th, Curran was not heard from. At approximately 3:55 A.M., nearly three hours after his final call to the airport, he was in-

volved in a fatal collision with an oil tanker at a point between the airport and Wilmington, on the Industrial Highway in Pennsylvania, about five and one half miles south of the airport terminal where the dispatcher was located. The driver of a tractor-trailer, whose vehicle was on the outside lane of the two northbound lanes, testified that the tank truck was to his left and ahead of him, that he saw a flash of light, and then heard the crash. There is every indication that the vehicle the decedent was driving was in the inside lane of the northbound lanes heading south, i. e., in the direction of Wilmington. Curran died from his injuries shortly afterward. The day's money receipts were found. As previously mentioned, there is no evidence as to what Curran had been doing between 1:00 A.M. and 3:55 A.M. on the morning of the 29th.

■ To receive compensation for her husband's death, the claimant-widow had the burden of showing that at the time of the accident, at 3:55 A.M. on the 29th, her husband was acting in the scope of his employment. Collins & Ryan v. Hudson, 6 Terry 438, 75 A.2d 261 (Super.Ct.1950); McCormick Transp. Co. v. Barone, 8 Terry 202, 89 A.2d 160 (Super.Ct.1951). If Curran's fatal injuries were disconnected from his employment, his death is not compensable under Workman's Compensation Law. The rule is simple, but its application is difficult, and the conclusion depends entirely upon the facts and circumstances in each case. See Ristine v. Moore, 190 Pa.Super. 610, 155 A.2d 456, 458 (1959). Moreover, the role of this Court in deciding appeals from the Industrial Accident Board is limited to determining questions of law and whether there is substantial evidence to support the Board's findings. The question before this Court is whether there is substantial evidence in the record to support the finding of the Board, and its finding was that the decedent was not within the scope of his employment at the time of the accident. This finding is an assumption which is made from the Board's sole

conclusion that the widow had the burden of proof and failed to sustain it.

Apparently, the Board was dissatisfied with the widow's inability to explain the three hour gap between the 1:00 A.M. telephone call and the 3:55 A.M. accident and her inability to explain what deceased was doing in Chester at 1:00 A.M., which inference is raised by the dispatcher's testimony that Curran's last call was from a Chester exchange.

■ Without a doubt, the widow's burden under the circumstances was difficult. The nearly three hour time delay could never be explained by her. She does not know what her husband did that morning No one else seems to know. The implied assumption is that he was on his own business. But no one knows. Whatever information there was available on his movements prior to the accident were more easily discoverable by his employer than by his widow. But there is some information available that strongly indicates that the decedent had finished with whatever he had been doing and had returned to his normal duties as an employee. The widow should not be barred if there was evidence before the Board that makes it reasonably probable that by 3:55 A.M., Curran had resumed his normal employment. Atlanta Furniture Company v. Walker, 51 Ga.App. 781, 181 S.E. 498 (1935); Curtis v. Royal Indemnity Co., 101 Ga.App. 158, 112 S.E. 2d 819 (1960); see Stehli v. Stehli, 62 N.J. Super. 117, 162 A.2d 289, 292 (1960); Taylor v. Director of Public Works and Supply Department, 121 Ind.App. 650, 100 N.E.2d 831 (1951).

Was there such evidence? The record shows that Curran was driving his employer's station wagon, and that he was authorized to do so. He inferentially was driving in the direction of Wilmington on the portion of road that was nearly always used for Shuttle traffic from the airport. Curran's receipts were given to his employer by claimant at the hospital later that day, allowing the inference that

these receipts were removed from decedent's person, and that these receipts would have been returned to the garage as usual to be counted at 8:00 A.M.

■ Is not this sufficient evidence to require the employer to come forth and rebut the prima facie case of employment by him of decedent at the time of the fatal collision? *I think it is!*

In Curtis v. Royal Indemnity Co., 101 Ga. App. 158, 112 S.E.2d 819 (1960), the decedent-employee was a truck driver by day and worked at night at another job unconnected with his daytime employment. His daytime employer allowed him to drive his truck home for the mutual benefit of both. The decedent would, as a matter of practice, drive the truck to his nighttime job's site, perform his work; then he'd drive the truck to his home. On the night of his death, decedent left his daytime job at 7:00 P.M. He was found after a fatal collision at 11:00 P.M., apparently en route from his nighttime job to his home. The Court reversed a lower Court which had overturned the Commission's award, and held that the acts of leaving the nighttime job's site and driving the employer's truck in the direction of the decedent's home, constituted a resumption of employment.

In White v. Frank Z. Sindlinger, Inc., 30 N.J.Super. 525, 105 A.2d 437 (1954), the decedent-employee was a crane operator who had the use of the employer's pickup truck to go to and from work. After working on a crane at the jobsite, the decedent bought some beer and then proceeded, along with a fellow employee, to his employer's workshop. There decedent loaded the pickup truck with implements for the next day's work. Both employees then stopped for more beer, after which they traveled to a bar where they met a third person. At the bar the decedent had two more beers. Afterwards the three parted company and the decedent crane operator started driving in the direction of his home, along the customary route. Some time later, approximately two hours after he had left

the job's site, the crane operator was found dead in the overturned truck, along the same road. The Court held that the accident arose in the course of his employment. The Court conceded on the facts before it that the employee deviated in point of time and at 105 A.2d 439, 440, the Court stated:

"[T]here is no question that such deviation had terminated, because decedent was on the road home when his death took place, proceeding along the usual route leading from the place where he customarily left Mayer * * * to the Allenwood residence. * * *

"Petitioner here sustained the burden of proof required in compensation cases; namely, that her husband was employed by respondent, that the truck was furnished him for the convenience and purposes of the employer; that it was decedent's duty to take his assistant, Mayer, home to Lakewood, that he did so and then met death as a result of the accident while following the usual highway route from Lakewood to his home. The nature of the employee's duties exposed him to the highway danger; the accident was directly attributed to a risk of the highway to which the employment exposed him and the injuries, and death followed as a rational sequence from a risk connected with the employment."

The reasoning in these cases should apply here. To reiterate: Curran was employed by Airport Shuttle Service, Inc., and was allowed to use its vehicle, during the period in question, to go to and from work. He was killed as a result of a risk connected with his employment, while he was headed in the direction of Wilmington along the customary and almost exclusively used road from the airport toward Wilmington. His only remaining duties after 1:00 A.M. were to drive the vehicle to the garage and place the previous day's money receipts in the safe so that they would be there at 8:00 the morning of the 29th. He presumably had such receipts on his person. There is every indication that Curran was

 

headed toward Wilmington with the receipts, and that they would be located by the authorized employee of the company in the place where they were always located at 8 A.M. on the 29th. The claimant-widow's failure to explain what Curran had been doing that morning prior to his death should not be used as a basis for denying compensation to her.

This is no less true with respect to Mrs. Stranghan's testimony. Mrs. Stranghan testified that while she listened on the telephone, she heard Curran give the operator the telephone number and exchange from which he was calling. She said this was a Chester exchange. This testimony could be damaging insofar as it might give rise to an inference that Curran was returning to Chester rather than to his home in Wilmington. The use of this testimony to show Curran's location at 1:00 A.M. on the 29th is not proper. The truth of what Curran said to the operator and overheard by the disptacher was placed in issue. It was location testimony which the dispatcher "heard say" rather than that based on her personal knowledge or observation. 29 Am.Jur.2d, "Evidence", § 497, p. 555. But even if this were not hearsay, it would be the rankest speculation to use this "overheard" exchange and number to determine where the decedent was calling from earlier in the morning. The trier of facts should not so speculate. While it is true that the Board is not bound by the technical rules of evidence, nonetheless, the Board should not base its award or deny an award upon evidence which is incompetent. General Chemical Division, etc. v. Fasano, 8 Terry 546, 94 A.2d 600 (Super.Ct.1953). Mrs. Stranghan's non-expert evidence should have been disregarded for the purpose for which it was used.

I conclude that the widow met her burden. She showed a prima facie case of employment at the time of the fatal accident. The employer presented no evidence to the contrary. There was no evidence that Curran had ever "frolicked" in the past or on this night, nor was there evidence supplied by the employer that would indicate that the decedent ever failed to have his day's receipts in the garage safe at 8:00 A.M. There is no justification for speculating against this decedent. The Board's decision must be reversed and this case is remanded to the Board with directions to enter an appropriate award for claimant.

It is so ordered.